**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO. _____**

IN RE APPLICATION OF
SOCIEDAD MILITAR SEGURO DE VIDA
pursuant to 28 U.S.C. § 1782
For Judicial Assistance in Obtaining
Evidence From LT Investment Inc.,
LifeTrade Management Company, LLC,
AVS Servicing LLC, AVS Underwriting LLC,
Wells Fargo Bank, N.A.,
JPMorgan Chase Bank, N.A., John Marcum,
Roy Smith, and Phillip Loy,
For Use In a Foreign Tribunal
_____/

### SWORN DECLARATION OF JORGE HECTOR DIAZ

I, the undersigned, Jorge Hector Diaz, under oath and penalty of perjury, under the laws of the United States of America, 28 U.S.C. § 1746, and duly authorized, declare the following:

1. I have worked for Sociedad Militar Seguro de Vida ("SMSV") for approximately 38 years, where I presently hold the position of Finance Manager. As Finance Manager for SMSV, I am responsible for (a) managing all of SMSV's funds received through deposits in savings accounts, time deposits, and other means, (b) providing financial assistance to SMSV's subsidiaries, (c) making investment decisions with respect to surplus funds, (d) managing the purchase and sale of securities, and (d) providing other various financial services.

2. I am of legal age and provide this declaration (the "Declaration") in support of the *Application for Judicial Assistance in Obtaining Evidence for Use in a Foreign Tribunal Pursuant to 28 U.S.C. § 1782* filed by SMSV (the "Application"). Except as otherwise indicated, all facts set forth herein are based upon my own personal knowledge or my recollection of information learned from my review of relevant documents.

3.      SMSV is an organization based in Argentina that provides an array of financial services for members of the country's armed services, including, managing salaries and pensions, attracting outside investments, and lending money. In the ordinary course of business SMSV makes certain investments with respect to the funds it manages.

4.      In 2003, SMSV began making investments in The Lifetrade Fund, B.V., (the "Fund") an investment fund incorporated in Curacao allegedly focused on the life settlement investment market. It is my understanding, that the Fund allegedly invested in securities backed by a diversified, seasoned pool of life insurance policies issued by a broad group of high credit quality, carefully regulated U.S. insurance companies.

5.      Based on my review of the Fund's prospectus and other Fund related documents, it is my understanding that the Fund's investments were purportedly managed by an entity called Lifetrade Management Company, LLC ("LMC") which is "part of the AVS Group." The Fund's prospectus also provides that LMC subcontracted its role as investment manager to its wholly-owned subsidiary Lifetrade Asset Management N.V. ("LAM") and that LAM also served as the Fund's "Collateral Manager and Servicer."

6.      Furthermore, it is my understanding that AVS Servicing LLC was a "Sub-Servicer" for the Fund and that AVS Underwriting LLC, which was acquired by LMC in 2010 according to Fund documents, served as a life expectancy provider or "LE Provider" for the Fund.

7.      Based on my review of the Fund's relevant documents, it appears that LMC, LAM, AVS Servicing and AVS Underwriting (collectively, "AVS") were all responsible for administering and servicing the Fund's investment portfolio and that each entity played a critical role in the decision-making concerning the Fund's business operations. These entities also



appear to have coordinated their activities with the Fund's bankers (JPMorgan Chase Bank, N.A. and First Caribbean International Bank) and the Fund's Administrator (HBM Fund Services B.V.). Indeed, a number of the Fund's marketing materials make reference to the Fund's relationship with JP Morgan Chase, First Caribbean, and HBM Fund Services.

8. The Fund's prospectus and documents also indicate that Roy Smith and John Marcum, the Managing Directors of LMC, served as the Fund's "Management Team." It is also my understanding that Roy Smith is the Chairman and Founder of the Fund and that John Marcum is the CEO of LCM. The Fund's correspondence to shareholders, including SMSV, also indicates that Lifetrade Management Company N.V. is another Managing Director of the Fund and that this entity is managed by TMF Curacao N.V. and Roy Smith.

9. Based on SMSV's relationship with the Fund, it is my understanding that the Fund solicited investments from a broad investor base which includes institutions, public authorities, pension funds, and professional investors to finance the purchase of securities connected to the life settlement market. It is also my understanding that the Fund maintained a credit facility with Wells Fargo Bank N.A. which was originally entered into on or around June 25, 2008 in the amount of $500 million. It is my understanding, that on June 26, 2009, the Fund's credit facility was reduced to $225 million and on October 4, 2010 it was reduced again to $200 million.[1]

10. It is my understanding, that the Fund's obligations with respect to the Wells Fargo credit facility are secured by the Fund's assets, which includes primarily the Fund's life settlement investment portfolio. Based on documents provided by the Fund, it also appears that

---

[1] The reasons for the decrease in the size of the credit facility and many of the details surrounding the use of the credit facility by the Fund remain unknown, but are relevant to SMSV's claims pending in Curacao and potential other claims that may exist against the parties responsible for SMSV's losses.



the Fund and its affiliate, Lifetrade Life Settlements Ltd. (Ireland) ("Lifetrade Ireland") are guarantors under the Wells Fargo credit facility.

11. In 2008, in the normal course of its investment strategy, SMSV redeemed its entire investment in the Fund. However, beginning in 2010, SMSV began reinvesting in the Fund in increments of $500,000 to $2,000,000, until the total amount invested in the Fund reached approximately $14.5 million in 2011. SMSV based its investment decisions on the information provided by the Fund and its agents—namely, LMC, AVS, Roy Smith and John Marcum—as well as the Fund's annual audited statements prepared by KPMG Associates B.V. ("KPMG"). Further, SMSV received shares in exchange for its investment and these shares could be redeemed over a period of time based on a scale that penalized early redemptions.

12. Between August and September 2011, the Fund began actively requesting an in-person meeting with SMSV executives in Atlanta, Georgia for the purpose of soliciting additional investments from SMSV.

13. On October 4, 2011, the Fund delivered a solicitation letter to SMSV seeking an additional $5 million investment. That letter which was signed by the Fund's CEO, John Marcum, specifically requested that SMSV confirm their "new subscription" for $5 million based on the following caveats: (a) the total amount would be subscribed during the month of October 2011; (b) the total amount would be subscribed with the NAV valuation of October 1, 2011; and (c) in the event of a crisis in Argentina, SMSV would tender a redemption request and the Fund at the management's discretion would provide a maximum of 10% liquidity without penalty during the first year and 20% liquidity during the second year.

14. On October 9, 2011, representatives of the Fund and SMSV met at the Ritz-Carlton in Atlanta, Georgia for the purpose of discussing SMSV's investment in the Fund. On



4

October 10, 2011, representatives from the Fund and SMSV met at the offices of AVS located at 175 Town Park Drive, Suite 400, Kennesaw, Georgia. Those present at these meetings on behalf of SMSV included Mr. Jorge Diaz, Mr. Guillermo Duhalde, and Mr. Hermenegildo Barbosa. Those present on behalf of the Fund, included: Guillermo Herrera, Director; Rafael Martino, Regional Director for Argentina; John Marcum, CEO and Executive Director of LMC; Philip Loy, CEO of AVS; and Antonio Com, Managing Director of AVS.

15. At the meeting, SMSV's representatives requested and received information regarding the Fund's investment process with respect to the life settlement market, including among other things, the Fund's method of evaluating and purchasing policies, measuring life expectancies, valuing policies incorporated into the Fund's portfolio, monitoring maturing policies, and the legal risks associated with the Fund's investments processes. The information the Fund received during the Atlanta meeting contained references to and representations made by the Fund with respect to its agents, specifically, LMC, AVS, Roy Smith and John Marcum.

16. In summary, the Fund used the Atlanta meeting to promote itself and to solicit an additional investment by SMSV into the Fund. No disclosures were made at this meeting related to the Fund's financial condition or its deteriorating credit situation, nor was there any disclosure made as to the potential suspension of redemptions absent additional cash flows.

17. For its part, AVS presented a summary of its role as a provider of asset management and other services to the Fund. Additionally, AVS gave SMSV's representatives certain AVS marketing and promotional materials that SMSV relied on, together with the Fund's representations, in making its investment decisions. The full extent of AVS' role and liability for the events leading to SMSV's losses remain unclear, however, it is clear that AVS and its



principals are likely to be in possession of important evidence concerning the Fund, the Fund's activities and finances and the Fund's principals during the relevant period.

18.     Following the meeting in Atlanta, the Fund sent a second solicitation letter to SMSV on October 12, 2011, requesting confirmation of the additional $5 million investment previously discussed in Atlanta. This letter was signed by Roy Smith and is similar to the letter dated October 4, 2011 except that now the Fund was willing to provide SMSV, in the event of a crisis in Argentina, a maximum of 20% liquidity without penalty during the first year and 10% liquidity during the second year.

19.     On October 27, 2011, SMSV decided to make an additional investment in the Fund totaling $4,999,955 based on the representations made to it by the Fund during the meetings in Atlanta. With this additional investment, SMSV's total investment in the Fund was now approximately $14,499,810.

20.     Between November 2011 and March 2012, SMSV's investment in the Fund was believed to be operating within normal parameters. Regular statements from the Fund were received and analyzed by SMSV and the strategy at the time was for SMSV to remain invested in the Fund for at least six years to avoid penalties for early redemptions.

21.     In March 2012, SMSV learned that the Fund's investment manager suspended publishing the Fund's Net Asset Value ("NAV") and suspended all investor redemptions on March 1, 2012. In a letter from the Fund to shareholders dated March 8, 2012, the Fund cited several reasons for these suspensions. Among them, the Fund noted that within "the next 12 months, investors may submit redemptions for over 30% of the net asset value of the Fund." The Fund also represented that it was renegotiating its credit facility with Wells Fargo Bank and that it was unsure whether it would be able to successfully do so. The letter also noted that on



February 23, 2012, Japanese financial regulators had ordered an investor in the Fund to suspend its operations for a month (for reasons not described). The letter ultimately informed investors that it could not "determine the outcome of the investigation or liquidity requirements that this could create." As of April 2012, the Fund's portfolio was allegedly comprised of 481 life insurance policies reportedly having a face value of $912 million.

22. The Fund scheduled an extraordinary general meeting of shareholders (the "EGM") for May 17, 2012, for the purpose of discussing and voting on three separate options related to the renegotiation of the Fund's debt with Wells Fargo Bank. Option A entailed delivering the entire Fund's portfolio of life settlements to Wells Fargo in exchange for the extinguishment of the Fund's debt. Option B called for the negotiation of a bridge loan with Wells Fargo in order to buy the Fund additional time to renegotiate its credit facility. Option C called for the Fund to seek approximately $95 million in additional financing from a mezzanine lender.

23. SMSV analyzed these three options with the assistance of an auditing firm. During this process, SMSV and its advisors analyzed information provided by the Fund, including, the Fund's audited financial statements by KPMG, and concluded that each of the three options presented to shareholders was problematic or unlikely to succeed. For this reason, SMSV wrote a formal letter to Fund proposing a fourth option for renegotiating the Fund's debt with Wells Fargo Bank. This option included a voting provision for certain Fund shareholders in order to afford them greater control over the Fund's decision-making process.

24. SMSV's proposal was rejected ahead of the EGM, allegedly, because it was untimely and could not be added to the agenda for the meeting. SMSV and its counsel attended



the EGM and advocated there again for the adoption of a strategy that was different from the three proposed by the Fund.

25. Ultimately, the shareholders of the Fund elected to proceed with Option C despite the fact that SMSV did not vote in favor of this option. It is my understanding based on information later disclosed by the Fund, that the Fund was working to complete negotiations with an unidentified mezzanine lender prior to June 15, 2012, but no details are known about those efforts or alleged negotiations.

26. SMSV later learned that on or around August 8, 2012 Wells Fargo moved to foreclose on certain notes issued by Lifetrade Ireland, the entity believed to be the true ultimate owner of the life insurance contracts securing the Wells Fargo credit facility.[2] Subsequently thereafter, the Fund announced that a settlement was entered into between Lifetrade Ireland and Wells Fargo on August 14, 2012. The settlement is believed to have allowed the Fund through the end of November 2012, to find a buyer for the portfolio to settle its debt with Wells Fargo and replace Wells Fargo as the secured lender.

27. To date, no further information has been received about the November deadline or the outcome of the Fund's efforts. In the meantime, SMSV has been unable to access its funds or redeem its shares in the Fund. Further, SMSV has yet to receive information regarding the Fund's financial position from the Fund's investment manager. As of April 2012, the current value of SMSV's total investment was approximately $14.5 million. Accordingly, SMSV has been damaged by the loss of its investment of approximately US $14.5 million in the Fund.

---

[2] According to documents provided by the Fund prior to the EGM, LT Investments, a discovery target in SMSV's Application, currently holds debt securities of Lifetrade Ireland which were acquired directly from the Fund in exchange for preferred shares in the Fund. LT Investments maintains an address in Georgia and is likely to have relevant documents and information in its possession regarding Lifetrade Ireland's transaction with Well Fargo, the value of the Fund's life insurance portfolio, and any due diligence information provided to both Wells Fargo and KPMG regarding the Fund's financial position and its annual financial statements.



28. During the period between May and November 2012, SMSV undertook an exhaustive review of its investments with the Fund, including an investigation of the Fund's solicitations and representations as well as the role of the Fund's principals and managers in the same solicitations and investments. Following this internal investigation, SMSV concluded that a number of material misrepresentations and omissions were made to secure SMSV's investment in the Fund.

29. Accordingly, on December 18, 2012, after serving appropriate demand letters, SMSV filed an action in the Court of First Instance of Curacao against LMC, Roy Smith, John Marcum, TMF Curacao N.V., and KPMG in an attempt to recover its losses.

30. SMSV files an application pursuant to 28 U.S.C. § 1782 to request judicial assistance in obtaining evidence in the hands of persons and entities located in the United States so that it may effectively prosecute its action currently pending in Curacao.

31. SMSV's 1782 Application has not been filed for the purpose of violating, circumventing, or frustrating any law or rule of procedure or evidence and I have been advised that there is no known law or rule prohibiting the filing of the instant Application. Indeed, SMSV's Application is filed only for the purpose of obtaining relevant evidence in the possession of U.S.-based parties and third parties for use in foreign legal proceedings.

32. Based on the current circumstances and the age of the transactions at issue here, I believe there is a danger that the evidence sought by SMSV through its Application may be lost due to normal document retention policies and the passage of time. For this reason, SMSV has requested that the Court order the U.S.-based discovery targets identified in the Application to preserve any and all relevant and responsive evidence until the conclusion of the 28 U.S.C. § 1782 proceedings or further order of the Court.



THE DECLARANT HAS NOTHING FURTHER TO DECLARE.

Dated this 28 day of February, 2013.

_____
JORGE HECTOR DIAZ